# United States Court of Appeals
## For the First Circuit

No. 06-1709

UNITED STATES OF AMERICA,

Appellee,

v.

MATTHEW DWINELLS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lipez, Circuit Judge,
Selya, Senior Circuit Judge,
and Delgado-Colón,'* District Judge.

Christopher R. Goddu, Federal Defender Office, with whom Syrie Fried, Federal Defender Office, was on brief, for appellant.
Donald L. Cabell, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

November 20, 2007

'Of the District of Puerto Rico, sitting by designation.

**SELYA, Senior Circuit Judge.** We are called upon today to determine the legitimate scope of a congressional enactment aimed at the vexing problem of Internet predation. The statute in question, 18 U.S.C. § 2422(b), criminalizes the use of any instrumentality of interstate or foreign commerce, such as the Internet, to persuade, induce, entice, or coerce a minor to engage in criminal sexual activity. We conclude that, in enacting section 2422(b), Congress said what it meant and meant what it said. Consequently, we reject the appellant's thesis that section 2422(b) should be interpreted to include, as an additional element of the offense, an intent that the underlying sexual activity actually take place.

In view of this holding and our case-specific determination that the government adduced sufficient evidence to support the appellant's convictions on all the counts that were tried, we affirm the judgment below. The tale follows.

## I. BACKGROUND

Because this appeal involves a challenge to the sufficiency of the government's proof, we rehearse the facts in the light most favorable to the jury verdict, consistent with record support. See United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997).

For a period of approximately ten months beginning in the spring of 2002, defendant-appellant Matthew Dwinells engaged in

-2-

extensive Internet contact with three different correspondents thought to be teenage girls. In fact, the "girls" were histrionic law enforcement officers. That misconception proved to be the appellant's undoing.

The first electronic will-o'-the-wisp with whom the appellant communed was "Maria," whose on-line profile made her out to be a fourteen-year-old living in Dayton, Ohio. But on-line profiles can be misleading, and Maria was in actuality a persona developed by two Dayton police detectives.

In April of 2002, Maria entered a Yahoo chatroom dedicated to musings about love and lust.[1] There, Maria "met" the appellant, who truthfully identified himself as Matthew Dwinells, a forty-year-old man from Lawrence, Massachusetts. The conversation quickly accelerated through the mutual use of instant messaging, which allows Internet users to contact each other for private, one-on-one conversations. After only two chats, the appellant voiced his desire to marry Maria once she turned eighteen.

Further intimacies soon were exchanged. For example, the pair chatted about the style and color of Maria's panties, and Maria sent the appellant a picture of herself in a cheerleading

---

[1]The record is cryptic as to which of three such chatrooms — "I Love Older Men," "13+ Single Looking," or "16+ Single Looking" — hosted this first encounter. That uncertainty has no bearing on the outcome of this appeal.

outfit. Thereafter, the appellant declared that he wanted to have a baby with her.

All in all, the appellant conversed with Maria over the Internet on more than one hundred occasions. In addition, he initiated several telephone calls. After Maria responded positively to an inquiry as to whether she would like to see the appellant's penis, he sent her a picture of it by computer and then asked her in graphic detail exactly what she wanted to do with it.[2]

In various on-line chats, the appellant promised Maria that he would teach her how to swallow his ejaculate and asked her whether it was "OK" for him to take her virginity. He also stated that he wished Maria was with him, that he wanted her in his bed, and that — if she would mail him her underwear — he would start a clothes drawer for her in his house. In response to repeated requests of this sort, the detectives posing as Maria sent the appellant age-appropriate feminine undergarments and a series of staged photographs.

The appellant's amorous conversations were not characterized by much in the way of follow-through. He mentioned gifts of a diamond ring and a toe ring but never sent either one. Similarly, he said that he would give Maria a prepaid cellular telephone but never made the gift. He offered to buy, but did not

---

[2]Besides this webcam image, the appellant sent numerous other pictures of his penis to Maria over the course of their relationship.

-4-

actually purchase, lingerie for her. He promised her a $25 weekly allowance but failed to forward any cash. And on three separate occasions — in May, July, and August of 2002 — he made and then scuttled plans to visit her.[3]

The appellant apparently had a wandering eye. Beginning in July of 2002, he also started to chat electronically with "Paige," whose on-line profile described her as a fourteen-year-old girl from South Carolina.[4] Paige was a shared nom de plume for a local South Carolina police detective and a federal agent (a postal inspector investigating sex crimes) to whom he handed off the persona.

The appellant met Paige in a chatroom labeled "I Love Older Men," where Paige engaged in a sexually explicit conversation with him and said that she had sexually revealing pictures of herself. The appellant rose to the bait and expressed interest in these depictions. Paige requested, and received, his address (in Lawrence, Massachusetts). The appellant went on to ask for Paige's underwear, and the pair discussed how the appellant might visit Paige.

---

[3] After having broken one of his vows to meet Maria, the appellant sent her a gold chain as a sort of consolation prize.

[4] Paige's persona was not entirely consistent. At different times, she held herself out as either thirteen or fourteen years old. Moreover she claimed variously to be sexually experienced and to be a virgin.

Plans for a South Carolina rendezvous never came to fruition. The two agreed that they would meet in August, and, on August 13, the appellant promised to visit in two weeks. On August 17, the visit was rescheduled to August 30. But on August 28, the appellant informed Paige that work-related obligations precluded the assignation.

Notwithstanding this setback, the talk about a rendezvous persisted. In September, the couple discussed the possibility of Paige visiting the appellant in Boston. The appellant proposed that they meet at South Station (Boston's principal ground transportation hub) and signaled his intentions by observing that "if I get caught im in jail." Paige replied that she would keep their rendezvous secret and then began to mention specific flight and bus schedules that could take her to Boston. The appellant helped Paige make sense of the on-line schedules, checked to ensure that Paige had identification that would allow her to fly, and repeatedly assured her that he would send travel money. He continued to press her to transmit more photographs. The last conversation between the two occurred on September 14, 2002. The travel money never arrived.

The same postal inspector later developed a new persona: thirteen-year-old "Ashley," Paige's cousin from South Carolina. On September 27, Ashley and the appellant met on-line. The appellant immediately sought to obtain pictures of her. In a chat less than

-6-

three weeks later, Ashley expressed a fear of the roving sniper who was then terrorizing Washington, D.C.  The appellant gallantly told her to "come here" so that he could keep her safe.  He offered her travel money but worried aloud that if she came, it would be "rape" if they slept together.  Ashley assured him that she would consent and, thus, avoid the stigma.    Apparently grateful for this concession, the appellant promised Ashley that should she become impregnated, she would receive $250,000 as the beneficiary of his life insurance policy.

In the end, Ashley never received any travel money from the appellant.  He did, however, buy lingerie for her in exchange for a promise to send him the underwear she was wearing as well as some photographs.  On two occasions — one in 2002 and again in 2003 — the appellant made vague promises that he would visit Ashley. Neither trip materialized.

On March 19, 2003, federal authorities conducted a warrant-backed search of the appellant's home.  The appellant was present at the time of the search.  A dresser drawer in the appellant's bedroom contained greeting cards, lingerie, and pictures sent by Maria.

After having been arrested, the appellant agreed to speak with a law enforcement officer.  Among other things, he confessed to having movies and photographs of child pornography on his computer.

-7-

In a later sworn statement, the appellant admitted that his on-line actions were "wrong," but vouchsafed that he had acted "just for fun" and had thought of the Internet as "fantasy land." He said that his "intentions were strictly fantasy" and that he never intended to meet any of the young girls, engage in sex with them, or do anything more than chat.

In due course, a federal grand jury indicted the appellant on three counts of attempted enticement of a minor. See 18 U.S.C. § 2422(b). The indictment charged that the appellant had attempted to entice the three young "girls" (one per count) into engaging in acts that would violate either a Massachusetts statute prohibiting sexual intercourse with minors under sixteen years of age, Mass. Gen. Laws ch. 265, § 23 (2007), or a Massachusetts statute prohibiting unnatural and lascivious acts with such minors, id. ch. 272, § 35A. A superseding indictment added two more charges: one for receipt of child pornography, 18 U.S.C. § 2252(a)(2), and one for possession of child pornography, id. § 2252(a)(4)(B).

After some preliminary skirmishing (not relevant here), the appellant pleaded guilty to the two child pornography counts and proceeded to trial on the three enticement counts. The trial lasted six days. The appellant testified on his own behalf, advancing both an entrapment defense and a "fantasy" defense. Under the latter theory, he left himself room to maneuver: he

-8-

either knew that his correspondents were adults or believed that
their conversations constituted mutually entertained fantasies, in
which proposals for assignations and lurid descriptions of sexual
acts were merely fanciful embellishments in an elaborate game.  The
jury was not buying; it rejected these defenses and found the
appellant guilty on all three counts.  The district court denied
his renewed motion for judgment of acquittal and, on March 9, 2006,
sentenced him to fifty-one months in prison.  This timely appeal
followed.

## II.  **ANALYSIS**

Before us, the appellant propounds two claims of error.
One relates to statutory interpretation; the other relates to
alleged evidentiary insufficiency.  We discuss them separately.

### A.  **Statutory Interpretation**.

The appellant's most touted ground of appeal concerns the
interpretation of the statute of conviction.  That statute reads in
relevant part:

> Whoever, using the mail or any facility or
> means of interstate or foreign commerce, or
> within the special maritime and territorial
> jurisdiction of the United States knowingly
> persuades, induces, entices, or coerces any
> individual who has not attained the age of 18
> years, to engage in prostitution or any sexual
> activity for which any person can be charged
> with a criminal offense, or attempts to do so,
> shall be [punished as provided].

18 U.S.C. § 2422(b) (2000).

-9-

Plainly, the statute requires that a defendant possess the specific intent to persuade, induce, entice, or coerce a minor into committing some illegal sexual activity.[5] The appellant contends that an additional "intent" element should be read into the statute: an intent that the enticed conduct actually take place. Ably represented, he musters a plethora of arguments in support of that position.

The appellant first strives to convince us that a double intent requirement, such as he envisions here, is not a curiosity. We agree to some extent with his premise: reading a criminal statute to provide for a double intent would not be without analogues in the law. Many statutes criminalize an act when paired with an intent to perform some other, distinct act. A common example is breaking and entering with intent to commit a felony. See, e.g., Mass. Gen. Laws ch. 266, § 17 (2007). Yet, typically, such statutes provide explicitly for that additional element of intent. See, e.g., id.; Cal. Penal § 459 (West 2007); N.Y. Penal Law § 140.30 (McKinney 2007).

Seen in this light, the appellant's premise does not take him very far. In stark contrast to the mine-run of statutes involving heterogenous intent requirements, there is nothing on the

---

[5]The four verbs contained in the statute — persuading, inducing, enticing, and coercing — signify different things. In the interests of brevity, we use the term "entice" throughout this opinion to encompass all four.

face of section 2422(b) providing for an added "intent" element. Thus, the appellant's analogues have a boomerang effect. Section 2422(b) appears to be the opposite of what the appellant envisions — a statute in which Congress deliberately refrained from including an additional "intent" element.

The appellant next asks us to take into account the substantial jail sentences — up to fifteen years — attendant to violations of section 2422(b). It would be implausibly draconian, he maintains, for a fifteen-year incarcerative sentence to attach to an attempt to entice unaccompanied by a corresponding intent to consummate the underlying sexual activity.

This is a shell game — an argument that hinges on matters of policy, not on statutory construction. Absent Eighth Amendment concerns — and none are apparent here — it is not the proper function of the courts to act as super-legislatures, passing judgment upon Congress's penological determinations. See, e.g., Neal v. United States, 516 U.S. 284, 295-96 (1996).

Another observation seems pertinent in response to this plaint. Congress recently amended section 2422(b), see Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, § 203, 120 Stat. 587, 613, marking the third consecutive increase in the maximum available sentence for violations of section 2422(b). See Pub. L. No. 104-104, § 508, 110 Stat. 56, 137 (1996) (establishing maximum imprisonment term of ten years); Pub. L. No.

-11-

105-314, § 102, 112 Stat. 2974, 2975-76 (1998) (increasing maximum term to fifteen years); Pub. L. No. 108-21, § 103(a)(2)(B) & (b)(2)(A), 117 Stat. 650, 652, 653 (2003) (inserting five-year mandatory minimum and increasing statutory maximum to thirty years). To us, this suggests a crystallizing vision on Congress's part of the need for stern punishment in this milieu.

Perhaps more importantly, by the time Congress passed the most recent amendment to the applicable penalty provisions, every court of appeals that had reached this issue had determined that section 2422(b) does not include an additional "intent" element. See United States v. Thomas, 410 F.3d 1235, 1244 (10th Cir. 2005); United States v. Patten, 397 F.3d 1100, 1103 (8th Cir. 2005); United States v. Murrell, 368 F.3d 1283, 1286 (11th Cir. 2004); United States v. Bailey, 228 F.3d 637, 639 (6th Cir. 2000). Assuming, as we are inclined to do, that Congress keeps itself apprised of developments in the federal courts, we find the most likely inference to be that Congress fully intended to treat acts like those attributed to the appellant with the utmost gravity, whether or not the accused intended that the enticed sex acts be consummated.

The appellant further suggests that his proposed interpretation of the statute is desirable because of either the rule of lenity or the principle of constitutional avoidance. These suggestions are unpersuasive.

The rule of lenity provides that in a criminal case, a court must resolve statutory ambiguity in favor of the accused. Bifulco v. United States, 447 U.S. 381, 387 (1980); United States v. Nippon Paper Indus. Co., 109 F.3d 1, 7 (1st Cir. 1997). "But the sine qua non for the rule's application is genuine ambiguity, and a statute is not ambiguous simply because litigants (or even an occasional court) question its interpretation." United States v. Ahlers, 305 F.3d 54, 62 (1st Cir. 2002); see United States v. Jimenez, ___ F.3d ___, ___ (1st Cir. 2007) [2007 WL 3171348, at *6] (explaining that "genuine ambiguity requires more than a possible alternative construction").

The appellant tries to paint a picture of uncertainty by arguing that the courts of appeals have split over the interpretation of section 2422(b). But the case law does not support that gloomy assessment. Although two courts of appeals, whilst upholding convictions under section 2422(b), have mentioned the defendant's intent to engage in sexual acts, see United States v. Meek, 366 F.3d 705, 718 (9th Cir. 2004); United States v. Farner, 251 F.3d 510, 513 (5th Cir. 2001), such a finding was not necessary to the decision in either instance. Equally as significant, neither court sought to resolve the issue of what kind of intent was required by the statute. Those decisions are, therefore, of no assistance to the appellant.

-13-

Insofar as we can tell, the decisions that are on point uniformly reject the "double intent" hypothesis. See United States v. Brand, 467 F.3d 179, 202 (2d Cir. 2006); Thomas, 410 F.3d at 1244; Patten, 397 F.3d at 1103; Murrell, 368 F.3d at 1286; Bailey, 228 F.3d at 639. We consider this view confirmed — not weakened — by the recent decision in United States v. Goetzke, 494 F.3d 1231 (9th Cir. 2007). There, the Ninth Circuit seems to have held that section 2422(b) does not require proof of an intent that the sexual acts take place. See id. at 1236.

That ends this aspect of the matter. Because the rule of lenity applies only when the meaning of a criminal statute is genuinely uncertain, Ahlers, 305 F.3d at 62, the rule simply does not pertain here.

The canon of constitutional avoidance is equally inapposite. That canon teaches that Congress is presumed to legislate in accordance with the Constitution and that, therefore, as between two plausible constructions of a statute, an inquiring court should avoid a constitutionally suspect one in favor of a constitutionally uncontroversial alternative. See Ashwander v. TVA, 297 U.S. 288, 341 (1936) (Brandeis, J., concurring); United States v. Nascimento, 491 F.3d 25, 38 (1st Cir. 2007). The appellant asseverates that, without a requirement that the accused intend consummation of the enticed sex acts, section 2422(b) would threaten speech protected by the First Amendment and, accordingly,

-14-

that we should read that additional element into the statutory text.

This asseveration rests upon a porous foundation.  For one thing, the doctrine of constitutional avoidance does not come into play unless alternative constructions of a statute are "fairly possible."  United States v. X-Citement Video, Inc., 513 U.S. 64, 69 (1994).  Here, the absence of any ambiguity defeats the constitutional avoidance argument.  See, e.g., Jones v. United States, 529 U.S. 848, 857 (2000) (noting that, as a precondition to application of the canon of constitutional avoidance, the statute in question must be fairly susceptible to differing constructions); Nascimento, 491 F.3d at 38 ("Courts simply are not free to interpret statutes as becoming inoperative when they approach constitutional limits.") (internal quotation marks omitted).

For another thing, implementation of the doctrine of constitutional avoidance also requires the presence of "substantial constitutional questions."  X-Citement Video, 513 U.S. at 69.  But there is no realistic danger that section 2422(b), as we have interpreted it, criminalizes protected speech.  Speech intended deliberately to encourage minors' participation in criminal sexual conduct has no redeeming social value and surely can be outlawed under the same rationale that allows proscription of the provision of pornography to minors.  See Ginsberg v. New York, 390 U.S. 629, 637-43 (1968).  And where, as in this case, speech is the

-15-

instrumentality of the crime itself, the First Amendment provides no shelter from the government's exercise of its otherwise valid police powers. See United States v. Tykarsky, 446 F.3d 458, 473 (3d Cir. 2006); Meek, 366 F.3d at 721; United States v. Rowlee, 899 F.2d 1275, 1278 (2d Cir. 1990); see also United States v. Hornaday, 392 F.3d 1306, 1311 (11th Cir. 2004) ("Speech attempting to arrange the sexual abuse of children is no more constitutionally protected than speech attempting to arrange any other type of crime.").

As a fallback, the appellant argues that section 2422(b) is overbroad in light of the Internet-specific principles laid down by the Supreme Court in Reno v. ACLU, 521 U.S. 844 (1997). In our view, the Reno principles have little traction here.

The Reno Court struck down a section of the Communications Decency Act of 1996 (CDA) that criminalized the knowing transmission of "indecent" material to minors via the Internet. Id. at 859 (citing 47 U.S.C. § 223(a) (1994 ed., Supp. II)). It also struck down another section of the CDA that outlawed the act of knowingly making available to minors on the Internet materials which were, when measured by contemporary community standards, "patently offensive." Id. at 860 (citing 47 U.S.C. § 223(d) (1994 ed., Supp. II)). The Court anchored its decision on two bases: first, it concluded that the terms "indecent" and "patently offensive" were so vague as to chill protected speech. Id. at 874. Second, it concluded that the two sections of the CDA,

-16-

in combination, prohibited an intolerably large amount of protected speech among adults. See id. at 874-79. State-of-the-art technology, at that time, provided no effective means of excluding minors from adult-oriented Internet fora, see id. at 876-77, and therefore the provisions in question inevitably would muffle substantial amounts of protected adult speech. See id. at 877-78.

The most crucial facet of the Reno scenario is missing here: this is a situation in which nothing but unprotected speech is either threatened or chilled. There is no possibility that intruding minors might, by their mere presence in an Internet forum, render protected speech illegal. After all, legitimate inter-adult communications are not proscribed by section 2422(b). And if a protected communication falls outside the scope of section 2422(b) for some reason — perhaps the speaker does not believe his auditor to be a minor or the discussion does not comprise an attempt to entice a proscribed sex act — the mere introduction of a minor's presence will not bring the communication within that scope. Thus, the heckler's veto emphasized by the Reno Court, id. at 880, does not emerge here.

The lack of any First Amendment infirmity confirms our decision to construe section 2422(b) in accordance with its unambiguous language. Section 2422(b) criminalizes an intentional attempt to achieve a mental state — a minor's assent — regardless

-17-

of the accused's intentions vis-à-vis the actual consummation of sexual activities with the minor.

To say more about the statutory interpretation point would be supererogatory. The statute, construed without the exogenous "intent" element envisioned by the appellant, is within the bounds of Congress's legislative power. The district court read and applied the statute accordingly. We therefore reject the appellant's attempt to reinvent the statute.

## B. **Sufficiency of the Evidence**.

Once the jury returned its verdict, the appellant renewed his motion for judgment of acquittal. See Fed. R. Crim. P. 29(c)(1). The district court denied the motion. The appellant demurs, arguing that the evidence did not support his convictions on two of the three enticement counts, namely, count 2 (the Ashley interactions) and count 3 (the Maria interactions). Presumably because of the explicit planning of a trip by Paige to Boston for meritricious purposes, the appellant does not challenge the sufficiency of the evidence on count 1.

The familiar standard that applies to sufficiency-of-the-evidence challenges requires that a court "determine whether, after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the

crime." United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994). We review a trial court's Rule 29 determination de novo, applying this standard. See United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002).

The appellant's challenge has its roots in the peculiarities of the statute of conviction. Section 2422(b) criminalizes the enticement of minors into "criminal offense[s]" of a sexual nature, but the statute is silent as to which sovereign's law defines those offenses. The decided cases fill this gap; they indicate that such offenses may be defined by the laws of any of the several states.[6] See, e.g., Goetzke, 494 F.3d at 1235 & n.2; Patten, 397 F.3d at 1103-04; United States v. Panfil, 338 F.3d 1299, 1300 n.2 (11th Cir. 2003); see also United States v. Dhingra, 371 F.3d 557, 565 (9th Cir. 2004).

In this instance, the indictment accused the appellant of having sought to entice his targets to commit sexual acts rendered illegal by Massachusetts law. It specifically mentioned Mass. Gen. Laws ch. 265, § 23 (criminalizing engagement in sexual intercourse with a child under the age of 16), and Mass. Gen. Laws ch. 272, § 35A (criminalizing commission of an unnatural and lascivious act with a child under that age). Consequently, the district court instructed the jury that it could not find the appellant guilty on

___

[6]It is not necessary for us to decide, and we therefore leave open, whether such an offense may be defined by federal law.

a particular count unless it found beyond a reasonable doubt that
he attempted to entice the "minor" in question to perform unlawful
sexual acts within Massachusetts. Given this instruction — which
has become the law of the case, see United States v. Gomes, 969
F.2d 1290, 1294 (1st Cir. 1992) — the government concedes that, in
order to sustain a conviction, the record must contain sufficient
evidence of this Massachusetts nexus.

As to the challenged counts, the evidence supporting that
nexus is not overwhelming. We briefly rehearse what the jury
supportably could have found in that regard.

As to count 3, there was evidence that, on July 1, 2002,
the appellant asked Maria to send him some of her lingerie. He
stated that he would start a clothes drawer in his house for the
underwear that Maria sent him, responded favorably to Maria's
proposal that she move in with him (inferribly in Massachusetts),
and declaimed that he "want[ed] [Maria] to have our baby." The
conversations then became salacious and sexually explicit. For
example, the appellant told Maria that he was "horny," that his
"penis [was] hard," and that he would engage in oral sex with her
if they were together.

On July 3, 2002, the appellant (who was in Massachusetts)
stated that he wanted Maria in his bed "now," mentioned that he had
a teddy bear and satin sheets for his bed, and described how he
would perform oral sex upon her. Then, on November 7, 2002, as

-20-

Maria repeatedly gave her eager assent, the appellant successively typed "I want you in my arms," "in my bed is that ok?," "making love all night?," and "do you want to make a video tape of us making love?"

As to count 2, the appellant's communications were less effusive but in much the same tenor. For instance, on October 10, 2002, Ashley mentioned her fear of the D.C. sniper and the appellant bade her to "come here" — that is, to come to Massachusetts — and promised to send some travel money.[7]  The appellant then typed that if "I sleep with you its rape" and noted his disinclination "to go to jail." This outburst of anxiety was calmed by Ashley's assurance that she would consent to sex.  The appellant then got down to basics: he queried her as to whether she wanted sex, wanted a "baby girl," and could "handle [his] sex drive."  Ashley responded affirmatively each time.  When the appellant pleaded for Ashley to stop "teas[ing]" him, she protested that she was not playing games and that she didn't "play with peoples heads."  Apparently reassured, the appellant boasted that he had a $250,000 life insurance policy and told Ashley that if "you get pregnant you will get it."

In light of this and other evidence, we believe that reasonable jurors could conclude, as these jurors did, that the

---

[7]The fact that the appellant did not keep this promise is relevant, but that fact does not cancel out the invitation.

appellant sought to entice both Maria and Ashley into undertaking proscribed sexual acts within Massachusetts. In conversing with Maria, he referred to the prospect of sexual activity taking place in his own bed (and, thus, in Massachusetts) and followed up on a suggestion that Maria might move in with him by making explicit sexual overtures. Moreover, the appellant's descriptions of satin sheets and a dedicated clothes drawer arguably served as lures to entice his correspondent to come to Massachusetts. See, e.g., Goetzke, 494 F.3d at 1235; United States v. Munro, 394 F.3d 865, 869-70 (10th Cir. 2005). Given Maria's supposed age, it would not be a stretch for the jurors to find both that Massachusetts was the intended locus of the contemplated conduct and that the conduct would have violated one or both of the aforementioned Massachusetts statutes.

By the same token, rational jurors easily could have found that the appellant's invitation to Ashley to come to Boston was meant literally and that this invitation, coupled as it was with comments of an overtly sexual nature, entailed conduct that was to occur in Massachusetts. Given Ashley's supposed age, the jurors could have found both that Massachusetts was the intended locus of the contemplated conduct and that the conduct offended one or both of those statutes. That permissible inference is bolstered by the appellant's promise of a quarter-million-dollar life insurance policy should he impregnate her — an inducement that

-22-

would serve as a very powerful enticement to a thirteen-year-old girl who lacked enough money even to travel to Boston.

This is not to say that such a verdict was compelled on either count. The appellant's chief defense — that he was merely role-playing and thought that the communications were mutually entertained fantasies, comfortably remote from any prospect of consummation — is plausible. Moreover, that defense was buttressed by the appellant's persistent dodging of suggestions that he and his correspondents meet. But the government's theory of the case — that the appellant was engaged in earnest predation with persons he thought to be minors — also was plausible. That theory was reinforced by the appellant's own actions: his lewd comments, his participation in discussions about potential meetings, and his recurrent references to his home (which often were followed immediately by entreaties for sexual intercourse or other sexual favors).

In the end, everything depended upon which set of inferences the jury chose to draw. When the record is fairly susceptible of two competing scenarios, the choice between those scenarios ordinarily is for the jury. See United States v. Cruz-Arroyo, 461 F.3d 69, 74 (1st Cir. 2006); United States v. Fenton, 367 F.3d 14, 18 (1st Cir. 2004); see also United States v. Guerrero-Guerrero, 776 F.2d 1071, 1075 (1st Cir. 1985) (Breyer, J.) (explaining that jurors are "free to choose among varying

-23-

interpretations of the evidence, as long as the interpretation they choose is reasonable").

In the last analysis, the test is whether the evidence, taken in its entirety, supports the judgment of conviction; if it does, "[the government] need not rule out other hypotheses more congenial to a finding of innocence." United States v. Gifford, 17 F.3d 462, 467 (1st Cir. 1994). This is such a case: taking all the evidence, direct and circumstantial, in the light most hospitable to the verdict and resolving all evidentiary conflicts in favor of the verdict, Carroll, 105 F.3d at 742, a reasonable jury could have found the evidence adequate to ground convictions on counts 2 and 3.

## III. CONCLUSION

We need go no further. After canvassing and rejecting a plenitude of arguments as to why we should read into section 2422(b) an exogenous element that Congress did not mention when it drafted the statute, we conclude that the statute requires a construction befitting its unvarnished language. With respect to scienter, the statute requires only that a defendant intend to entice a minor to engage in proscribed sex acts — nothing more. Because this is so and because the government's proof was sufficient to convict, we uphold the judgment of the district court.

## Affirmed.